Filed 9/15/15  In re J.M. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAELA D.,<br><br>        Defendant and Appellant. | A144192<br><br>(Alameda County<br>Super. Ct. No. OJ13020878) |

California's juvenile dependency scheme strikes a balance among the goals of protecting children from neglect and abuse, preserving existing families, and providing children with permanent stable homes in which to grow and thrive.  When a child is first removed from a parent's care due to neglect or abuse, the focus is on reunification.  However, the time allowed for reunification is limited so that children do not remain stranded in foster care, lacking the stability and security they need to develop into confident adults.  When the reunification period expires, the emphasis shifts to providing permanency and stability for the children.

J.M. was removed from the custody of his mother, Michaela D. (Mother) when he was about four months old due to neglect by both parents, arising from their mental health issues, domestic violence, and homelessness.  J.M. was placed out of state with his paternal grandfather and stepgrandmother (Grandparents).  At the 12-month review

1

hearing, the court terminated reunification services for both parents, and scheduled a Welfare and Institutions Code section 366.26 hearing.[1] Mother filed a section 388 motion for reunification or renewal of services, contending she had made substantial progress in resolving the problems that led to the dependency. At a combined hearing on Mother's petition and on termination of parental rights, the trial court denied her petition and rejected application of the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to termination of parental rights. We agree that Mother demonstrated progress in dealing with her issues, but nevertheless we must affirm.

## I.  BACKGROUND

Mother grew up in foster care, and from age five until 18 she lived mostly with a foster mother (Foster Mother) and at times also with Foster Mother's sister (Foster Aunt). When she was 21, she gave birth to J.M. At the time, Mother and J.M.'s father (Father)[2] were living with Mother's biological mother in a crowded three-bedroom apartment in the Bay Area. Foster Aunt was in the Bay Area. Foster Mother was living in Germany and called Mother about once a month.

About a week after J.M.'s delivery in January 2013, the family began receiving public health services. The Alameda County Social Services Agency (Agency) reported that Mother "handle[d] [J.M.] as she would handle a toy. She throws him up and catches him. During the first few weeks following [his] birth [Mother] needed reminders to support his neck. [She] attempts to make [him] stand. [She] seems disconnected from [him] at times. She does not respond to his cues and does not hold him properly. [On March 26, 2013, she] had him on her lap and was hitting his back really hard. When it was pointed out to her that she was hitting [him] rather than patting him, she continued to hit him." J.M. also lost weight early on until Mother's biological mother took over responsibility for feeding him. Mother had diagnoses of bipolar disorder, depression and ADHD and had a history of psychiatric hospitalizations. Father reported a diagnosis of

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

ADHD and schizoaffective disorder, depressive type, with no current symptoms. Neither parent was on medication but both were trying to secure new prescriptions. Both had criminal histories. They denied any domestic violence or drug or alcohol abuse.

Mother and Father faced eviction as a result of their ongoing arguments, which occurred even in the presence of service providers. On April 23, 2013, Mother was arrested for assaulting Father. The next day Father bailed Mother out of jail and she resumed care of J.M. On May 1, J.M. was taken into protective custody; he had lost 10 ounces in 12 days when he should have been gaining an ounce every day or two. Father apparently told a social worker that, because he and Mother would be homeless as of May 3, he preferred that J.M. be taken into custody.

On May 3, 2013, the Agency filed a petition on J.M.'s behalf pursuant to section 300, subdivision (b) (neglect). The petition alleged the April 23 assault, arrest and eviction; Father's bailing out Mother and allowing her to resume care of J.M.; J.M.'s weight loss; and Father's statement that J.M. should be taken into custody because the parents faced homelessness. The court ordered J.M. detained on May 6. Mother and Father remained homeless.

At a June 2013 jurisdiction hearing, Mother and Father agreed to accept J.M.'s removal on the understanding the petition would be amended and Grandparents would be assessed for J.M.'s placement in Pennsylvania. Mother and Father reported they were taking their medications and looking for stable housing. J.M. was placed in foster care.

According to the Agency's November 2013 status review report, Mother was in a housing program, seeing an individual therapist, and taking her prescribed medications. The Agency had referred her to domestic violence classes. Mother and Father consistently attended joint weekly visitation with J.M. "Sometimes . . . there seemed to be some competition between the parents . . . [and Mother] has [a] hard time consoling or putting [J.M.] to sleep." The Agency provided weekly infant-parent therapy beginning in October. Meanwhile, the Grandparents were undergoing the placement approval process. They met with J.M. one weekend in September and planned to visit him again in November. J.M. was happy, healthy and developmentally on target. At the

3

November 21, 2013 six-month hearing, the court ordered continued reunification services.

On March 24, 2014, the court ordered J.M.'s placement changed to Grandparents' home in Pennsylvania. "Both parents state that they are not in the place to take care of [J.M.] and would like [him] to be cared [for] by [Grandparents] under legal guardianship." J.M. was transitioned into their care in April 2014.

The Agency's April 2014 status review report stated that Mother had left a three-month temporary housing placement in February and was staying with a friend while she looked for permanent housing. She had not taken advantage of certain housing services offered to her. She had been approved for disability benefits and was working occasionally. She had stopped engaging in individual therapy the prior January.[3] As of January 2014, she had visitation separate from Father and had visited consistently except when she or J.M. was sick. The visits went well. Mother continued to participate in infant-parent therapy and as a result had been able to think about J.M.'s experiences and needs. She reported being compliant with her medication but had not attended a psychiatric appointment or enrolled in domestic violence classes.

At the 12-month hearing in April 2014, the court found that reasonable services had been provided, that Mother and Father had made only partial progress toward resolving the issues that led to the dependency, and that J.M. could not safely be returned to their care. It terminated both parents' reunification services, ordered continuing visitation, and scheduled a section 366.26 hearing for August.

In May 2014, Mother moved to Georgia to live with Foster Mother, who had moved there from Germany.

A.      *Change in Permanent Plan*

In July 2014, the Agency changed its permanent plan recommendation from guardianship to adoption, as Grandparents had asked to adopt J.M. Grandparents said

---

[3] Mother later testified the therapist was transferred to another program and a replacement was not available. Mother continued her medications.

4

they intended to maintain J.M.'s ties with Mother and Father, with visits arranged based on availability and "consistent with [J.M.'s] well being." Mother and Father were communicating with J.M. via Skype and by phone, and they were allowed to visit him in person in Pennsylvania. J.M. was happy, healthy and developmentally on track, and he seemed to be developing an attachment to Grandparents.

Mother traveled from Georgia to attend the August 2014 section 366.26 hearing in California. She objected to the permanency plan and asked for renewed reunification services. She presented evidence that she had obtained individual therapy on her own initiative and said she would file a section 388 petition. She explained that her visitation with J.M. was limited by the high cost of traveling from Georgia to Pennsylvania, and asked for Agency assistance with travel. A contested section 366.26 hearing was scheduled for November.

In a November 2014 section 366.26 report, the Agency reported that J.M. had developed a bond with Grandparents. Grandparents again said they intended to continue allowing J.M. to maintain contact with his parents.

B.    *Section 388 Petition*

On November 7, 2014, Mother filed a section 388 petition seeking a renewal of reunification services or the return of J.M. to her care. As changed circumstances, she wrote: "Mother agreed to termination of reunification services based on [Grandparents'] agreement to become legal guardians of [J.M.] They have now requested to adopt [J.M.] [Mother] now has housing, has continued to comply with her case plan, and has consistently visited with [J.M.] to the best of her ability." Mother argued that granting the petition was in J.M.'s best interest because "[she] has benefit[ted] from reunification services. She has been appropriate with [J.M.], has found h[ou]sing, has an income, has been medication compliant. [J.M.] would benefit from placement with his biological mother who has demonstrated that she can meet his needs."

C.    *Contested Hearing*

Evidentiary hearings on both the section 388 petition and the section 366.26 matter took place on November 13, 2014, and January 22, 2015. The November hearing

5

had been continued to December 2014, but Mother's counsel had a family emergency and a further evidentiary hearing was continued to January 2015. Mother appeared at all three hearings. Grandparents appeared at the December 2014 hearing, but they did not have an opportunity to testify at that time. The court allowed them to testify by telephone at the January 2015 hearing. The following evidence was presented at the hearings.

*Before the Move to Georgia*

Foster Aunt had been in touch with Mother during and after her pregnancy and had offered housing and support to Mother and the baby. "Unfortunately, we felt that [Mother and Father's] relationship wasn't a very health[y] relationship and [we weren't] ready to open our home to [Father]." Therefore, Mother chose to live with Father at her biological mother's home. Foster Mother first learned about J.M.'s removal at the end of the summer of 2013 when she moved to Georgia from Germany.

Mother testified that she agreed to termination of services and establishment of a guardianship without being told the consequences of the decision and under the belief she was "[s]igning over legal guardianship rights temporarily" until she could get back on her feet. She agreed because she did not want J.M. to grow up in foster care like she had. She never affirmatively waived her right to services.

*Move to Georgia*

Foster Mother and Foster Aunt—both of whom had extensive experience and training in early childhood development and were currently employed in the discipline— were committed to supporting Mother so she could reunify with J.M. Foster Mother had known Mother for 13 years. She and Mother had moved to a four-bedroom home where they lived with Foster Mother's mother, who occupied an in-law unit. Mother was welcome to stay at the home indefinitely. At the December 2014 continued section 366.26 hearing, Mother asked the Agency to assess the home for placement, but the Agency objected and the court declined to order an assessment unless necessary for visitation.

6

*Work and Education*

Mother was earning income to supplement her disability benefits. She was babysitting for a three-year old in her home from Friday to Sunday including overnights, tutoring older children after school on weekdays, and caring for children at a church three days a week. In November 2014, Mother testified that when she returned to Georgia she would start working for a day care provider. However, when the social worker contacted the day care provider to confirm the offer of employment, the provider said Mother had to do a few more things before she could be considered for employment.

*Services*

In November 2014, Foster Mother testified that Mother was participating in services to the best of her financial ability without assistance from the Agency. Mother testified that she was taking her prescribed medications and seeing the prescribing doctor once or twice a month. She had completed a four-hour online parenting class and could take additional courses in the future. She did not take domestic violence classes because she understood she could take parenting classes instead. Mother said she had attended individual therapy two to three times a month since about June. In late November, however, the therapist told the Agency that Mother had only had four therapy sessions in July and one in October. Other sessions that had been scheduled were cancelled by Mother. Due to the limited contact, they had not started to work on any substantive issues.

Following the November 2014 hearing, Mother stayed in California pending the December hearing. She volunteered to take parenting and domestic violence classes from certain providers while she was in California. However, she apparently was not eligible for the domestic violence classes from the provider she identified, and Mother said she was too old to take parenting classes from the other provider she initially identified. In January 2015, Mother testified that she had started a therapy program with three sessions per week—one involving one-on-one parenting education, another for anger management and domestic violence training, and the third for individual therapy. She said each session lasted about two hours and she had attended about 12 sessions. The social worker

had not heard about Mother's participation in the new therapy program until Mother's testimony at the January hearing. Mother also testified that she was still compliant with her medication regimen and she would continue to be compliant. The social worker had been unable to verify information regarding Mother's psychiatric treatment.

*Experience with Children*

Mother took care of a seven-year-old child with ADHD and a three-year-old child during the summer of 2014, and the children's parents were pleased with the quality of care. From June to August, Mother cared for Foster Aunt's seven-year-old daughter (who was visiting in Georgia) while Foster Mother was at work. She provided appropriate care and the child appeared attached to Mother. Mother also cared for children through babysitting, tutoring and working with the church youth group. Additionally, Foster Mother took Mother along on home visits in her job as an early intervention worker "to kind of give her an idea of how to . . . developmentally and appropriately interact with small children." Foster Mother testified that Mother was appropriate and very interactive with the children and would ask questions when she was not sure what to do.

*Skype Video Chats*

Mother testified that she Skyped with J.M. every Saturday morning for about an hour and would do so more often, but Grandparents would not let her. In January 2015, she testified that she was still Skyping with J.M. every Saturday except when her Internet connection failed or her phone did not work. Foster Aunt and Foster Mother had observed Mother Skype with J.M. and reported that she was enthusiastic, interactive, loving, and appropriate, and that J.M. was aware of who Mother was.

Paternal stepgrandmother testified that she reviewed her Skype account and noted the dates and durations of Mother's Skype calls to J.M. She testified that the first Saturday J.M. lived with Grandparents was April 12, 2014, but Mother's first call was on May 3. During the period of April 12, 2014 through January, 18, 2015 (a total of 40 weeks), Mother made 23 calls ranging in duration from about 15 minutes to 1 hour and 15 minutes.

*In-person Visits*

When J.M. went to Pennsylvania, the court ordered continued visitation as frequently as possible consistent with the child's best interest. The social worker testified that she informed the visitation supervisor in Pennsylvania that Mother had received weekly supervised one-hour visits when J.M. resided in California. After discussing the distance between Mother's and J.M.'s residences, however, they decided that two-hour visits every other week was a more realistic visitation schedule.

Mother visited J.M. in Pennsylvania on June 16 and 23, 2014. She drove 12 hours each way from Georgia to attend the visits at her own expense. Although Mother repeatedly asked Grandparents to meet her halfway, they declined. Grandmother testified, "I do not feel comfortable without having anyone from an Agency being present to witness any issues that could arise." The visits were limited to two hours and took place in a social service agency building. Mother asked Grandparents for more visitation time and for a chance to leave the building with J.M., but they denied her requests. Mother did not visit J.M. in Pennsylvania again until January 2015, although she had one visit with him in December when they were both in California for a court hearing. Mother had also sent J.M. gifts.

Mother wanted to visit J.M. more frequently, but could not afford the trips. Each visit cost her $500 to $600 cost for a rental car, gas and lodging (not counting food). She also had to pay for her trips to California for dependency hearings as well as all of her services (psychiatric visits, therapy sessions, medical appointments, parenting classes) from Social Security disability benefits and limited additional income. Mother had asked for Agency financial assistance with visitation in August 2014, but the Agency never provided assistance. The social worker testified that the Agency did not fund visitation after termination of reunification services. In December 2014, the court said, "[I]f the burden o[n] [Mother] to visit up north to Pennsylvania could be a little bit alleviated by extended hours or whatever, the Court would certainly like that to happen. . . . But I'll leave that up to the Agency."

9

Foster Mother accompanied Mother on the June 2014 trips to Pennsylvania and observed Mother's arrival at the visits and her departure from the first visit. During the first visit, "[J.M.] saw [Mother] and he looked and he buried his head in [Grandmother's] chest. . . . And then . . . [Mother] was talking to [him] . . . and he was smiling and talking with her. And then after the visit when they came out, she was holding him . . . . [¶] [W]hen [Mother] was giving him back to the Social Worker . . . , he was pulling at her shirt to the point where she was almost exposed." During the second visit a week later, "[J.M.] was ready to go with [Mother]." In Foster Mother's opinion, there was a "type of bonding" between J.M. and Mother. "The fact that he turned when he saw her. He saw all of us. He did not look at any of us. He looked at his mom. . . . The fact that he was holding onto her so tightly. . . . [There is] some type of secure attachment there. . . . She's somebody special . . . ."

Mother described her December 2014 visit with J.M. in California as follows: "As a kid, he was everywhere, playing with one toy one minute, then he wanted to move to the next toy. [¶] . . . [¶] [H]e wouldn't make eye contact with me that much. He was everywhere. He's a kid. . . . When I did call his name, he'[d] look." She denied that J.M. did not want to play with her during the visit. The social worker described the visit as follows: "[J.M.] did not protest when [Grandparents] left but went to the door and waiting room many times. [He] moved from toy to toy. [Mother] sometimes introduced a toy to him but he moved to a different one pretty quickly. [J.M.] did not make much eye contact with [Mother], nor did he engage her in his play. [Mother's] affect was flat during the visit. She sat on the [couch], sometimes watching him and sometimes trying to engage him. . . . The interaction between [Mother and J.M.] was minimal. Toward the end of the visit, [Mother] bought a can of ice tea for [J.M.] as there was no [s]ippy cup in his bag[.] [J.M.] sat by her as she requested and took many sips. He smiled at [Mother]. When [Grandparents] returned, [J.M.] ran to the door and was picked up by [paternal grandfather]. . . . [J.M.] was asked by [Father] to give [Mother] a kiss, which he did. They said good bye to each other and [J.M.] left with [Grandparents and Father]." Stepgrandmother commented on the visit: "What I had observed is defiance with her

10

giving [J.M.] Brisk tea out of a can, and we had told her he does not get that type of stuff at home and we would prefer her not to give it to him. She proceeded to give him more of the Brisk tea allowing him to stick his tongue down into the opened metal part of the can and . . . also allowing him to put his lips down in there, and I told him, 'No. You're going to get hurt. You're going to cut yourself.' "

Mother requested a visit with J.M. in Pennsylvania during his birthday party in January 2015, but Grandparents were uncomfortable, so Mother had a supervised visit the next day at the social services building. At that visit, "[W]hen I first walked in, he walked up to me, jibber-jabber a little bit, . . . took off his hood, then we walked to the back of the place in the room to have a visit, we played with the birthday gifts, he opened them, he was excited, I read him some books, we played with Legos, and we bought him some food." Mother said, "He knows I'm his mother. . . . I'm a familiar face to him. [¶] . . . [¶] . . . He knows that I love him. He knows that I care about him. [¶] . . . [¶] I believe we have a bond. It may not be strong[er] than . . . the bond he has with [Grandparents], [but] that's because I don't get to visit him a lot."

The visitation supervisor described the January 2015 visit as follows: "[Mother] immediately began giving [J.M.] his birthday presents. [She] did not take [his] winter coat off. [J.M.] began playing with the dog dressed as a firefighter that [Mother] brought for him. [J.M.] tried wearing the dog's fire hat. [Mother] discouraged him [from doing] so because it 'isn't for you. It's for your doggy.' [Mother] attempted to play with blocks and read [J.M.] books but was unable to keep his attention. [J.M.] was not interested in being held by [Mother] and did not show an interest in getting a picture with her. . . . [¶] . . . [¶] . . . [J.M.] did not seem interested in playing with [Mother]. . . . [He] attempted to climb on [the visitation supervisor's] lap during the visit. [¶] . . . [¶] . . . [Mother] does not appear to have the knowledge to interact with a child of [J.M.'s] age. [She] seemed as though she expected [J.M.] to be able to manipulate toys he is not developmentally ready for. . . . [¶] . . . [¶] . . . [She] did not appear to have a strong bond with [J.M.]."

When asked if more visitation would have made a difference in the case, the social worker said, "[W]hen we were in [family reunification] phase, we would not even be able

11

to go beyond supervised visits and therapeutic visits. [So] I don't know if more visits would make too much difference."

*Grandparents*

There clearly was some tension between Mother and Grandparents. As noted, Grandparents did not allow Mother to attend J.M.'s birthday party or agree to increase her visitation time in Pennsylvania despite the substantial distance Mother traveled for the visits and the attendant cost. Mother posted comments on her Facebook page about feeling hurt and devastated by Grandparents' inflexibility and lack of communication about developments in J.M.'s life, and Grandparents apparently complained about the posts to the social worker. Grandmother testified that Mother's calls to her were "few and far between, but most of 'em are to try and see if we can either change the . . . time for the Skype or pretty much demand that she wants pictures or that she wants to talk to her son and that sort of thing. [¶] . . . [¶] . . . [Such as,] 'I want pictures. I should be getting pictures of my son. . . . I should be in my son's life. You're keeping him from me,' that sort of thing. [¶] . . . [¶] . . . It upsets me, because I'm not trying to keep him from her in any way, shape, or form." Grandmother testified that she would not try to contact Mother to find out what happened if she missed a scheduled Skype call. In December, conflict erupted between Mother and paternal grandfather when Mother asked to change the time of a Skype call. Grandfather testified: "I explained to [Mother] that this is the time that we set up prior to us getting [J.M.] . . . . She had no problem with it. [¶] She started yelling and cussing at me telling me that she has a right to change it, and I told her, '[Mother], I set this time every week for you.' . . . [S]he was told that, and she still said she wanted to change the time . . . ." Nevertheless, Mother and Grandparents seemed to generally be polite to each other. Mother and Foster Mother made positive statements about the Grandparents' care of J.M., and Grandparents said they wanted Mother to remain in J.M.'s life. Mother's counsel argued "if past actions are any indication, [Grandparents] may not let [Mother] be a part of [J.M.'s] life if parental rights are terminated."

12

D.    *Argument on Section 388 Petition*

Mother's counsel urged the court to grant the petition.  "This is not a young mother with a drug addiction, a history of pregnancy, or ongoing domestic violence.  This is a first-time mother who was in foster care struggling to take care of her baby away from her foster family, was homeless for a time, and who has returned to her family and made enormous changes and efforts in her life, all focused on what is best for [J.M.] and keeping [J.M.] in her life."  Given the limitations on visitation, Mother and J.M. had "as close a bond as is possible under the circumstances."

Father argued it would not be in J.M.'s best interests to reunite with Mother because he was "very, very stable with [Grandparents]."  Minor's counsel reserved judgment on the petition until after the close of evidence, and then urged the court to deny the petition.  "I think [this] is a classic case of changing circumstances and not necessarily changed circumstances . . . . [¶] . . . [¶] . . . This is her first child.  She was very young when she had [J.M.], and did not necessarily take advantage of services when they were offered. . . . [H]er participation in the case plan was partial. [¶] [I]t seems like she has made a lot of progress recently.  Particularly regarding her housing and the move to Georgia is probably one of the best things that she has done for herself and her son . . . . [¶] In terms of . . . parenting [classes], it seems like she had very minimal parenting [classes]. . . . [¶] In terms of mental health, I think her testimony is credible in that she has engaged in mental health services since I believe some time in 2013 . . . . [¶] Unfortunately . . . , [Mother hasn't] met the burden [of showing changed circumstances], two, [she hasn't] shown how the requested change is in the minor's best interest."

The Agency similarly argued there were changing but not changed circumstances.  "She's still showing immaturity in a rather strident way at times when she testified, and her behavior like on Facebook, cursing out [Grandparents] . . . . [¶] [S]he came across in some way like a petulant teenager, and she has not demonstrated the kind of maturity that is necessary for return of the child. [¶] . . . [¶] [I]f any [conflict] exists between [Mother and Grandparents], [it] is [Mother's] doing because she's angry that they have her child."

13

She did not really engage in services until December 2014, which was too little, too late. Because there was no strong bond between Mother and J.M., it was not in J.M.'s best interest to return to her care.

The court denied Mother's section 388 petition. "This is a very, very tough case. [¶] I've watched [Mother] grow over the months and now a couple years. I think she has made tremendous progress. . . . [¶] At first I thought [M]other actually has shown changed circumstances. She has shown stability in her life by housing. She has a job offer. She's working as a nanny. She's gone out of her way to visit, these long bus rides, to see her son . . . but I'm . . . stumbling a bit, because she is showing the immaturity at this point. The phone call to [Grandparents], . . . how she dealt with some redirection by [Grandmother] at the visit in December about the can, that could be very dangerous for a two-year-young child . . . . So the mother is not showing the parenting skills I think that she needs even at this point, but she's very close to it. So in good faith I can't even make the finding that she has fully changed her circumstances. [¶] . . . [¶] But if I did, [Mother], I sadly tell you that it is not in [the] best interest of [J.M.] to return [him] to you at this time. The child has not bonded with you. You even acknowledge that there's not a strong bond, and I appreciate that candor and that recognition."

On the section 366.26 matter, the court said, "The main issue is [whether] there [is] an exception to adoptability, and the only one . . . possible . . . is . . . a beneficial parental relationship[,] that is so compelling that it trumps adoptability?" The court found J.M. was adoptable, and found "there is a relationship. There is no question about it. The mother loves the child. The child did not push the mother away. There is kissing, and hugging, and touching, and playfulness between the two. The mother is able to show some parenting skills, frankly, not the best given the examples we heard through this testimony. But there is a relationship. [¶] Is it so compelling though to overturn the permanency this child has now achieved at least for the nine months that the child has been back in Pennsylvania with [Grandparents]? I'm going to have to say no." The court terminated parental rights. At the suggestion of minor's counsel, the court ordered

14

mediation regarding post-adoption contact with the parents. The results of that mediation are not in the record.

## II.   DISCUSSION

A.   *Telephone Testimony*

Mother argues the trial court erred by allowing Grandparents to testify by telephone at the final hearing. We disagree.

Grandparents appeared at a hearing on December 1, 2014, which had to be continued because of a death in the family of Mother's counsel. The court told Grandparents, "Normally, I would not allow appearance by telephone in that we are taking sworn testimony. But in that . . . you folks live in . . . Pennsylvania . . . [i]f you wish to appear by phone, I'll allow you to appear by phone. It's not the best way to do it . . . . [¶] . . . [¶] . . . It's very hard to check out the demeanor of the witnesses, especially me, and I have to look at you to get an idea if you're telling the truth or whatever." The attorney who was specially appearing for Mother's counsel reserved counsel's right to object to the ruling, and the court said, "[I]f [counsel] objects, she needs to . . . notify the Court almost immediately; and then when she does, to notify all the other parties through their attorneys[.]  [T]hen the Court will determine what to do at that point." Mother's counsel never lodged an objection. At the January 22, 2015 hearing, Grandparents testified by telephone. Mother's counsel successfully objected to their appearing as witnesses in the Agency's case-in-chief because they had not been listed on a pretrial witness list; consequently, they were limited to rebuttal testimony. But Mother's counsel did not object to their appearing by telephone.

Mother argues the allowance of telephone testimony is reviewable on appeal despite the absence of contemporaneous objection because the court lacked "jurisdiction" to allow witnesses to testify by telephone. She relies on *In re Andres G.* (1998) 64 Cal.App.4th 476, which reversed a disposition order despite the absence of a contemporaneous objection because the court had lacked jurisdiction to order the disposition. (*Id.* at pp. 483, 484.) The juvenile court removed the children from the parents' care based on clear and convincing evidence of a risk of harm and "placed" them

15

with relatives, but nevertheless "detained" them with the parents. (*Id.* at pp. 479–480 & fn. 2, 483.) The reviewing court held the disposition order was an act in excess of the court's jurisdiction, and thus invalid despite the parties' consent, because it "systematically contravene[d] a comprehensive statutory scheme" (*id.* at p. 483), which permitted only five specified dispositions, not including the one ordered by the court (*id.* at pp. 480–481).

There is no such specific statutory direction regarding the manner in which testimony may be provided in juvenile dependency hearings. Mother argues Evidence Code section 711—which provides, "At the trial of an action, a witness can be heard only *in the presence* and subject to the examination of all the parties to the action, if they choose to attend and examine" (italics added)—requires witnesses to testify in person. Courts, however, have held that this statute does not bar juvenile courts from taking testimony by child witnesses in chambers and outside the presence of parents in dependency cases, even before enactment of a specific statute that authorized such a procedure (§ 350, subd. (b)). (See *In re Mary S.* (1986) 186 Cal.App.3d 414, 416–420 [reviewing cases].) The "presence" requirement was deemed satisfied because the testimony was given in the presence of the parent's attorney, who had the opportunity to cross-examine the child witness. (*Id.* at p. 417.) Here, the Grandparents were "present" at the hearing by telephone, which afforded Mother a full opportunity for cross-examination. The "presence" language in section 355, which is cited by Mother but is not directly applicable here, may be interpreted in the same manner.[4]

Mother notes that no statute specifically *authorizes* the court to take testimony by telephone, but the courts have inherent power and wide discretion to "develop rules of procedure aimed at facilitating the administration of justice." (*In re Jeanette H.* (1990)

---

[4] Section 355, subdivision (c)(1)(D) provides, "For purposes of this section, the court may deem a witness available for cross-examination if it determines that the witness is on telephone standby and *can be present in court* within a reasonable time of a request to examine the witness." (Italics added.) Section 355 only applies to jurisdictional hearings.

16

225 Cal.App.3d 25, 34.) This is particularly true in dependency cases, where "[j]uvenile courts are required to 'control all proceedings with a view to the expeditious and effective ascertainment of the jurisdictional facts and of all information relevant to the present condition and welfare of the child.' " (*Id*. at p. 36; Cal. Rules of Court, rule 5.534(a).) Moreover, the practice of allowing testimony by telephone is not novel. Family Code section 3411, subdivision (b) allows out-of-state witnesses to testify by telephone in child custody proceedings, and Federal Rules of Civil Procedure, rule 43(a), authorizes the use of telephone testimony at trial "for good cause in compelling circumstances." Because the trial court did not exceed its jurisdiction in permitting telephone testimony, the ordinary forfeiture rule applies.

Finally, Mother argues the use of telephone testimony is reviewable despite the absence of a contemporary objection because the practice infringed on her constitutional confrontation rights. In criminal proceedings the defendant has a fundamental Sixth Amendment right to confrontation, which can be waived only by a knowing personal waiver by the defendant. (*In re Kerry O.* (1989) 210 Cal.App.3d 326, 331, 333.) In civil proceedings such as a dependency proceeding, the parties have a *Fifth Amendment* due process right to confront and cross-examine witnesses. The right is not coextensive with the Sixth Amendment right and a personal waiver is not always required. (See *Kerry O.*, at pp. 333–334 [no confrontation violation where parents' attorneys stipulated to admission of transcript of child's testimony in prior dependency hearing]; *In re Mary S., supra*, 186 Cal.App.3d at pp. 419–420 [no confrontation violation where minor was examined outside presence of parents]; § 350, subd. (b) [permitting child's testimony in chambers in certain circumstances].) Here, Mother's counsel received advance notice that Grandparents would testify by telephone, lodged no objection, and had an opportunity to cross-examine Grandparents and present rebuttal witnesses. There was no constitutional violation.

Mother also argues the testimony was inadmissible because the court did not properly administer the witness oath. Before Grandparents testified, the court said, "Normally I'd have you stand and raise your right hand, but we won't even see you . . .

17

so I'm not going to require that. But I am going to require you answer the oath question because we definitely want you under oath." Grandparents were then sworn in as witnesses. Mother argues the evidence was inadmissible under Evidence Code section 710 because "no one was able to observe [Grandparents] standing and raising their right hands." She made no such objection at the time of the hearing. Where the adequacy of the oath-taking is not raised at trial, the issue is deemed waived on appeal. (*In re Heather H.* (1988) 200 Cal.App.3d 91, 96.) The claim also fails on the merits. Evidence Code section 710 provides, "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law . . . ." The Grandparents each took the oath in the required form. Mother cites no authority in statute or case law requiring witnesses to also stand and raise their right hands when taking the oath, even if such is the usual courtroom custom. Therefore, her argument is unpersuasive.

B.     *Section 388 Petition*

Mother argues the trial court erred in denying her section 388 petition. We affirm.

Section 388 permits a parent to seek modification of a prior court order "upon grounds of change of circumstance or new evidence" and a showing that "the best interests of the child may be promoted by the proposed change of order." (§ 388; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 670–672.) The party who files the petition bears the burden of proving these elements, and we review a denial of a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

A section 388 petition filed after the termination of services and before termination of parental rights plays an important role in the dependency scheme. In *In re Marilyn H.* (1993) 5 Cal.4th 295, the Supreme Court upheld the constitutionality of section 366.26—which bars a juvenile court from returning a child to a parent's custody after termination of services—on the ground that section 388 "provides the 'escape mechanism' . . . to allow the court to consider new information [possibly justifying a return]. [¶] Sections 366.26 and 388, when construed together and with the legislative scheme as a whole, are reasonable and bear a substantial relation to the objective sought

18

to be attained. The parent's interest in having an opportunity to reunify with the child is balanced against the child's need for a stable, permanent home. The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority. Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances [by way of a section 388 petition] while protecting the child's need for prompt resolution of his custody status. Thus, both substantive and procedural due process are satisfied." (*Marilyn H.*, at p. 309.) Mother argues the trial court unreasonably denied her the benefit of this escape mechanism when it denied her section 388 petition.

Mother first argues the trial court committed legal error when it ruled that it could not order additional reunification services for Mother even if it found changed circumstances and the best interest of the child would be served by a renewal of services. The court reasoned that it was prohibited from renewing services because the maximum statutory period for such services had already expired.[5] Whether the court was absolutely barred from renewing services in such circumstances is not entirely clear. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2015) § 2.154[2][b], pp. 2-547 to 2-550.) However, we need not resolve this issue because it is apparent from the record that, even if the court believed it could renew services in granting the section 388 petition, the court would have denied such relief for the same reasons it denied Mother's request for a return of J.M. to her custody.

Mother clearly presented some evidence of changed circumstances, as the juvenile court acknowledged. At the time J.M. was removed at four months old, Mother was in a conflict-ridden relationship with Father and facing eviction; she had no reliable family

---

[5] At the outset of the joint contested hearing on the section 388 petition and section 366.26 matter, the court stated, "The Court's analysis . . . is that there is no issue about reinstatement of reunification services at this time because [Mother] has run out of time by law. [¶] On the other hand, what is right and alive is the possibility that the Court would order the return of the child to [M]other at this moment."

19

support; she was not taking medication for her mental health problems or engaging in services; she was unemployed; and her childcare skills were weak. At the time services were terminated a year later, Mother was taking her medications, had engaged in some therapy, and had visited consistently with J.M. However, she was just learning appropriate childcare skills, and she still lacked housing, employment, and family support. She also had not taken any domestic violence or parenting classes and apparently was not engaged in individual therapy or psychiatric treatment. When Mother filed her section 388 petition seven months after reunification services were terminated, she had stable housing and family support, had gained experience in childcare, was appropriate in visits with J.M., as well as taking her medications and engaging in therapy apparently to the extent she could afford to do so. She also had taken an online parenting class and possibly had a prospect of employment. Mother also had sought to maintain contact with J.M. despite the distance between them.

To justify modification of a court order, however, the change in circumstances must be significant in relation to the problems that initially brought the child within the dependency system. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) The changes in Mother's housing, family support, compliance with medication, and relationship (i.e., her separation from Father) were significant. Her participation in services, however, was fitful, belated or inadequate. Moreover, the trial court commented that her behavior remained immature, specifically referencing the incident with the can of iced tea at the December 2014 visit and her argument with paternal grandfather. The court also had the opportunity to observe Mother testify on multiple occasions and the Agency's counsel had argued that Mother acted like a "petulant teenager" on the witness stand. Maturity was relevant to the causes of the dependency action not only because of the instability of Mother's life when J.M. was an infant in her care, but also because she initially did not seem to understand how to care for a young child. Although Mother and Foster Mother testified that Mother had obtained child care experience in Georgia, the court could view that testimony with some skepticism in view of Mother's exaggerated testimony about other developments in Georgia. In sum, the court acted within its discretion in inferring

20

from Mother's recent conduct that she had not obtained a level of maturity that justified thwarting the permanent plan of adoption for J.M.

We likewise find that the court did not abuse its discretion in ruling that J.M.'s best interest would not be served by a change in the permanent plan. It was essentially undisputed that Mother did not have a parental bond with J.M., but only a friendly relationship. J.M. recognized her and showed no distress when visiting her or video chatting with her, but he did not show any kind of parental attachment to Mother. Mother correctly notes that there were arguably insurmountable obstacles to development of such a bond given the distance between her and J.M. and her lack of personal financial resources or financial assistance from the Agency. However, she does not argue on appeal that the Agency had an obligation to provide such financial assistance after the termination of services. Nor does she argue that her right to services or visitation was in any way violated. Mother had the benefit of one year of services in California and she unfortunately failed to forge a parental bond with J.M. during that time. Thereafter, the statutory scheme dictated a shift in emphasis from assisting her with reunification to providing permanency and stability for J.M., particularly given his young age. (See § 361.5, subd. (a)(1)(B), (3).)

Mother bore the burden of demonstrating that a modification would serve J.M.'s best interests, despite the fact that it would require another upheaval in his life. Regrettably, she was not able to make the required showing.

The same result is dictated by application of the three-factor test set forth in *In re Kimberly F.*: "First, and probably most basic, any modification under section 388 must consider the seriousness of the reason for the dependency in the first place. . . . [¶] A second important factor . . . is the strength of the existing bond between the parent and child . . . . [¶] Correlatively, the strength of a child's bond to his or her present caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond are also vital. . . . [¶] Finally, . . . the nature of the change [in circumstances], the ease by which the change could be brought about, and the reason the change was not made before bear on any such motion." (*In re Kimberly F.* (1997)

21

56 Cal.App.4th 519, 530–531; but see *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [criticizing *In re Kimberly F.* for insufficient emphasis on the shift of focus to a child's need for permanency and stability following termination of reunification services]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2015) § 2.140[5], p. 2-497 [same].) Here, the record demonstrates that Mother never developed a strong attachment with J.M. either before his removal or during the reunification period. There were no insurmountable obstacles to her reunifying with J.M. during her 12 months of services, yet she failed to obtain stable housing, consistently participate in services, or reach out to Foster Mother or Foster Aunt for family support until late in the case. That the obstacles to reunification later became more substantial does not excuse Mother's earlier failure to reunify or obligate the court to give Mother yet another chance. By the time the court ruled on the section 388 petition, the relative strength of the bonds favored Grandparents, particularly since J.M. had spent the last nine months with them and only had lived with Mother for the first four months of his life.

Mother claims she agreed to Grandparents' guardianship of J.M. only because she thought she would have the opportunity to reunify with J.M. once she got her life together. However, at the time the court terminated services, Mother had already exhausted 12 months of services, which is greater than the presumptive limit of six month of services for a child under the age of three (§§ 361.5, subd. (a)(1)(B); 366.21, subd. (e), par. 3), although a further extension of services was possible (§§ 361.5, subd. (a)(3); 366.21, subd. (f)). The court terminated services after finding that reasonable services had been provided and there was not a substantial probability that J.M. would be returned to Mother within six months (§ 366.21, subd. (g)(1), (4)), and Mother failed to challenge that ruling by filing a writ petition (§ 366.26, subd. (*l*)). Mother cannot demonstrate that her rights were violated when her services were terminated and the permanency plan went forward.

In sum, the court did not abuse its discretion in denying Mother's section 388 petition.

22

C.    *Beneficial Parental Relationship Exception*

Mother also argues the court erred in not applying the beneficial parental relationship exception to termination of parental rights.  We affirm.

"At a [section 366.26] hearing, the court may order one of three alternative plans: (1) adoption (necessitating the termination of parental rights); (2) guardianship; or (3) long-term foster care.  (§ 366.26, subd. (c)(1), (4)(A).)  If the child is adoptable, there is a strong preference for adoption over the other alternatives.  [Citation.]  Once the court determines the child is adoptable . . . , a parent seeking a less restrictive plan has the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B).  [Citation.]

"Section 366.26, subdivision (c)(1)(B)(i) provides for one such exception when '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'  [Citations.]

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence.  [Citation.]  It is not enough to show that the parent and child have a friendly and loving relationship.  [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." ' [Citation.]  For the exception to apply, 'a parental relationship is necessary . . . .' [Citation.]  ' "While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the

23

role of a parent." ' " (*In re J.C., supra,* 226 Cal.App.4th at pp. 528–529.) We review the trial court's findings of whether there was regular visitation and beneficial parental relationship for substantial evidence and the determination whether maintaining the relationship outweighed the benefits of adoption for abuse of discretion. (*Id.* at pp. 530–531.)

The record clearly demonstrates that Mother had a friendly relationship with J.M., but not a parental bond, much less a bond that outweighed J.M.'s right to permanency and stability. Courts have reversed denials of the beneficial parental exception where the children had lived with the parent for years before their removal and the child-parent bond was strong. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 293–294, 299–301 [child removed at 3 years old; child wanted to leave with parent at end of visits]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 684, 689–690 [children removed when they were five years, two years, and seven months old; bond of older child confirmed with bonding study; second child had difficulty separating from mother after visits]; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1203, 1207 [child removed at 6 years old; child wanted to live with mother and parent-child bond confirmed by psychologist].) Mother's situation is instead similar to cases where the parent has a friendly relationship with the child akin to that of an extended family member, but the child's parental bond is with the current caregiver. In such circumstances, the beneficial parental relationship exception does not apply. (See, e.g., *In re Derek W.* (1999) 73 Cal.App.4th 823, 825–827 [child removed at birth; child had "emotional bond" with father but "consistent, daily nurturing" provided by caregivers]; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1414, 1419–1420 [children removed at birth; children had "close" relationship with mother similar to that with other extended family members, but caregiver provided daily care, comfort, and nurturing].)

On review of the order of the juvenile court terminating parental rights, it is not our function to reweigh the evidence or express our independent judgment on the issues before the trial court. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423.) The court did not

24

abuse its discretion in refusing to apply the beneficial parental relationship exception to termination of parental rights.

### III. DISPOSITION

The order denying Mother's section 388 petition and terminating her parental rights to J.M. is affirmed.

_____
BRUINIERS, J.

WE CONCUR:

_____
JONES, P. J.

_____
NEEDHAM, J.